## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| BOB CAJUNE; CYNTHIA CAJUNE; KALYNN KAY AAKER; LION 194; JOHN DOE #1; MARY ROE # 1-7; N.W., a minor, by KALYNN KAY AAKER. | Court File No. 21-CV-1812-ADM-BRT |
| Plaintiffs, | |
| v. | **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS AND IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |
| INDEPENDENT SCHOOL DISTRICT 194 and MICHAEL BAUMANN in his official capacity as Superintendent of Independent School District 194, | |
| Defendants. | |

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 2

FACTS ................................................................................................................. 5

   I.    The Poster Series. .................................................................................. 5

   II.   The Understood Public Meaning of "Black Lives Matter." ............... 9

   III.  The District's Other Racially Biased Actions. .................................. 12

   IV.  The Plaintiffs Are Parents of Students, Residents, and Taxpayers of ISD 194. ....................................................................... 14

LEGAL ARGUMENT ...................................................................................... 15

   I.    Standard for These Cross-Motions. ..................................................... 16

   II.   Plaintiffs Have Standing as Parents, Students, or Municipal Taxpayers. .............. 18

       A.    Kalynn Aaker and Her Children Have Standing to Sue as a Parent of Students and as Students in the District. ..................................................... 18

       B.    The Pseudonymous Plaintiffs Have Standing to Sue, and the Court Should Grant Them Leave to Proceed Pseudonymously. ........................... 19

C.   The Municipal Taxpayer Plaintiffs Have Standing Under the
     *Everson* Case. ............................................................................... 20

     1.   *Huizenga* was wrongly decided, and this Court is not bound by
          other judges' decisions within the District. ........................................... 21

     2.   ISD 194 taxpayers have standing for the same reasons that
          compelled subsidy plaintiffs have federal court standing. ................... 25

     3.   Any fair reading of the Complaint would conclude that the
          "inclusive" Poster Series at issue resulted from the expenditure of
          District funds. ............................................................................................. 27

     4.   Vindication of First Amendment rights should be encouraged under
          the municipal taxpayer standing doctrine. ............................................ 27

D.   LION 194 Has Associational Standing. ...................................................... 28

III.   **Plaintiffs Are Likely to Succeed on the Merits.** ................................................. **28**

     A.   Plaintiffs Are Likely to Prevail on Their First Amendment Claims. .......... 29

          1.   ISD 194's Poster Series is not "government speech." ........................... 29

          2.   The hallways of ISD 194 are limited public fora. .................................. 34

          3.   ISD 194's allowance of "Black Lives Matter" and refusal of
               "All Lives Matter" or "Blue Lives Matter" is either content-based
               or viewpoint discrimination. ................................................................... 37

     B.   Plaintiffs Are Likely to Prevail on Their Hostile Educational
          Environment Claims. .................................................................................... 39

IV.   *Monell* **Does Not Apply Where the District Has Formally Approved the
      Racist Language at Issue.** ................................................................................. **41**

V.   **Superintendent Baumann Is Subject to Suit in His Official Capacity Under**
     *Ex parte Young***.** ................................................................................................. **41**

## INTRODUCTION

In April 2021, Defendant Lakeville Independent School District 194 ("ISD 194" or the "District") created a so-called " Poster Series" which included two posters with the political slogan, "Black Lives Matter." The two posters also state: "At Lakeville Area Schools we believe Black Lives Matter and stand with ***the social justice movement this***

*statement represents*. This poster is aligned to School Board policy and an unwavering commitment to our Black students, staff and community members." (emphasis added).

When other ISD 194 taxpayers and District residents, such as Bob Cajune, asked that alternative ideological viewpoints be presented alongside the Black Lives Matter posters, such as "Blue Lives Matter" or "All Lives Matter," ISD 194 refused to allow these rival viewpoints, stating "[ISD 194] does not approve of All Lives Matter or Blue Lives Matter posters in the classrooms or other areas of the school, and teachers/school staff are not allowed to wear shirts with these sayings to school;" and "the All Lives Matter and Blue Lives Matter mottos were created specifically in opposition to Black Lives Matter" and that those messages "effectively discount the struggle the Black students have faced in our school buildings and that Black individuals face in our society as a whole."

Plaintiffs have no problem with a "commitment to…Black students, staff and community members." It is a laudable thing to be committed to the well-being of all people. But Plaintiffs object to that supposed commitment being presented in the form of a divisive political message that is exclusive, not inclusive, and aligns the District with a racist, neo-Marxist, Black-separatist organization, which also calls for the destruction of the nuclear family. While ISD 194 claims allegiance only to the literal words, "Black Lives Matter," that claimed allegiance melts in the face of the District's refusal to allow the competing mantra that "all lives," which includes "black lives," matter.

The link between the phrase, "Black Lives Matter" and the political movement are inextricably intertwined in the minds of the public. Nine-year-old students understand this.

3

Plaintiff N.W., a nine-year-old former[1] student of ISD 194 who stated in ISD 194's June 8, 2021 board meeting: "We all know changing the font or the color of posters does not change the meaning. I am 9 years old, and I know that. You expect me to believe that you did not know what you were doing by making these posters? Come on, people."[2]

N.W. also stated at that Board meeting that "I do not judge people by the color of their skin, I don't really care what color their hair, skin, or eyes is. I judge by the way they treat me….I do not care or look at the color of skin, *but you make me think of it*. I have Asian, Mexican, white, Chinese, black friends and I don't care. I like them because some of them make me laugh, some are sweet and kind, sporty, or share the love of God. They are just my friends. You have lied to me and I am very disappointed in all of you." (emphasis added).

Not only does the Poster Series make the halls of ISD 194 hostile to students like N.W., ISD 194 has also admitted to Plaintiffs that the posters are private political expression provided by some members of the community. The District has stated: "the inclusive posters were requested by many staff and families in our school communities and

---

[1] Plaintiffs' counsel was unaware that N.W. had left the District after the Complaint was filed. Aff. of Gregory J. Joseph, Nov. 23, 2021. The first the undersigned heard of this was through ISD 194's affidavit to that effect. *Id.* Had Plaintiffs' counsel been informed before ISD 194 filed its affidavit—on a *Rule 12 motion*—Plaintiffs would have sought leave to amend. *Id.* Now, Plaintiffs are compelled to respond to that affidavit, and they do so with Plaintiff Kalynn Aaker's affidavit. Aff. of Kaylnn Aaker, Nov. 22, 2021. Ms. Aaker, N.W.'s mother, also has four other children in the District and is a member of the LION 194 association.
[2] https://www.washingtonexaminer.com/news/viral-video-minnestota-black-lives-matter-posters-schools (last visited Nov. 23, 2021).

was a project included within the district's inclusion work this school year," and they were "fully supported by our Board of Education"—not created by it. By posting the messages of the Poster Series in ISD 194's hallways, ISD 194 approves of and allows the private expression of District taxpayers, students, and staff who support the political ideology of the "Black Lives Matter" movement and organization. At the same time, ISD 194 suppresses divergent viewpoints, such as Plaintiffs'.

ISD 194's viewpoint discrimination has been confirmed by its collaboration with certain individuals from ISD 194 and outside the District for a Fall 2021 event called "Different Places, Beautiful Faces," which ISD 194's Equity Coordinator told Cynthia Cajune was to "highlight the diversity of our community, as well as to celebrate People of Color and Indigenous people in Lakeville and its surrounding communities." But when Ms. Cajune, a non-White individual, sought to include all ethnic backgrounds in the event, those controlling the event declared that "our interests are not aligned" and signed off with, "Black Lives Matter." ISD 194 has also instructed children as young as fifth grade that structural racism dominates our society and that Black Lives Matter is a political movement.

ISD 194's viewpoint discrimination violates the First Amendment and creates a hostile educational environment for its students, like Kalynn Aaker's children. Plaintiffs seek an end to this discriminatory practice, and the Court should end it here and grant Plaintiffs' motion for a preliminary injunction.

## FACTS

### I.     The Poster Series.

On September 22, 2020, Superintendent Michael Baumann issued a memo to ISD 194 educators in which he interpreted ISD 194 Policy 535 to prohibit teachers from displaying in their classrooms posters containing the phrase "Black Lives Matter." Compl. ¶19. Despite this contrary policy, in April 2021, ISD 194 approved an " Poster Series" that consisted of eight distinct posters, two of which included the phrase "Black Lives Matter." These "Black Lives Matter" posters also included the statement: "At Lakeville Area Schools we believe Black Lives Matter *and stand with the social justice movement this statement represents*. This poster is aligned to School Board policy and an unwavering commitment to our Black students, staff and community members." (emphasis added). Compl. ¶20.

On April 13, 2021, during the Equity Update portion of the ISD 194 Board Regular Meeting, the purpose of the Poster Series was given as "to support staff in creating school communities where students are respected, valued and welcome." Compl. ¶23. On April 26, 2021, Plaintiff Bob Cajune sent an email to Lydia Lindsoe, Equity Coordinator for ISD 194, inquiring about the Poster Series program and whether posters displaying "All Lives Matter" and "Blue Lives Matter" could be displayed by students and/or teachers in School District 194 schools. Compl. ¶24. That same day, on April 26, 2021, Lydia Lindsoe replied in email, stating, pertinently:

- "[ISD 194] does not approve of All Lives Matter or Blue Lives Matter posters in the classrooms or other areas of the school, and teachers/school staff are not allowed to wear shirts with these sayings to school;"

- the "purpose of the Poster Series is to create unity and ensure a sense of belonging for every student by affirming a wide variety of student identities;"

- "the inclusive posters **were requested by many staff and families in our school communities** and was a project included within the district's inclusion work this school year," and was "fully supported by our Board of Education" (emphasis added);

- "the All Lives Matter and Blue Lives Matter mottos were created specifically in opposition to Black Lives Matter" and that those messages "effectively discount the struggle the Black students have faced in our school buildings and that Black individuals face in our society as a whole;"

- "the history of Black people in America is singular and needs to be acknowledged;"

- "it is important that we specifically affirm Black students in our schools;" and

- because "Black people experience ["violence, racism, and oppression"] at the highest rate" and "[n]o other group was ever categorized as property or chattel, and the historical consequences of that experience are real and continue to be felt today," ISD 194 "does not approve All Lives Matter posters or Blue Lives Matter posters in classrooms."

Compl. ¶25.

According to public reports, "The district said the poster series went through a review process with focus groups that included students, school staff, school building leaders, the School Board, community advisory groups and others." Compl. ¶26. Based on ISD 194's statement on the Black Lives Matter posters themselves (quoted herein), and Defendants' response to Plaintiff Cajune, Defendants' inclusion of these posters is intended to promote the political organization Black Lives Matter and its position in the "social justice movement," which, to a reasonable member of the public, means that ISD 194 supports the viewpoint of Black Lives Matter and its Marxist and Black separatist, supremacist, and racist ideology that is hostile to White people as well as demeaning to Black people. Compl. ¶27.

Prior to the adoption of the posters, the District made similar statements pushing

back against the inclusion of "brown lives." At one District meeting, a resident said, "I have a brown kid," "and it always seems like the brown kids get left out of the Black Lives Matter stuff… if we could even make one of 'em 'black and brown lives matter' or something…?" March 17, 2021 Board Work Session, available at https://isd194letv.viebit.com/player.php?hash=cnRL9UBOdneP, Timestamp 1:51:00.

The District's rebuke was swift: "If you make it black and brown lives you're taking away from the historical and context (sic) of Black Lives Matter and what that means." *Id.* at 1:52:20. This exchange illustrates that parents and the District are aware that the "Black Lives Matter" political messaging *in these specific posters* marginalizes and deliberately excludes anyone who does not align with this philosophy and whose skin is not the preferred color. Moreover, it demonstrates that faculty and those responsible for the design of the posters are conscious that they constitute endorsement of one political ideology to the exclusion of all others, and that even a minor adjustment in messaging destroys the chosen discriminatory message.

Nine-year-olds within ISD 194 understand this. N.W. told the School Board at a recent meeting that its imposition of the Black Lives Matter posters in Lakeville schools makes her think of the political movement and its judgment of people based on the color of skin. Compl. ¶28.

Further, Defendants' argument to Plaintiff Cajune for excluding the phrases "All Lives Matter" and "Blue Lives Matter" acknowledges that Defendants understand that the phrase "Black Lives Matter" is associated with the private political organization of the same name, and, moreover, acknowledges that they intend that association to be understood

8

by their use of the phrase. Compl. ¶29. In addition, because the posters "were requested by many staff and families in our school communities," they are favored private speech of certain members of the ISD 194 community. Compl. ¶30.

## II.    The Understood Public Meaning of "Black Lives Matter."

The slogan, "Black Lives Matter" is well-known to be a neo-Marxist separatist slogan that identifies Black Americans as "part of the global Black family" and seeks to "disrupt        the        Western-prescribed        nuclear        family        structure." https://web.archive.org/web/20200917194804/https://blacklivesmatter.com/what-we-believe/ (last visited Nov. 23, 2021). The group "Black Lives Matter at School," for example, expressly includes "antiracist" doctrine as part of its principles. https://www.blacklivesmatteratschool.com/starter-kit.html; https://www.blacklivesmatteratschool.com/publications.html. (last visited Nov. 23, 2021) This same so-called "antiracism" can be summed up by the words of Ibram X. Kendi, the author of "How to Be an Anti-Racist":

> The only remedy to racist discrimination is antiracist discrimination. The only remedy to past discrimination is present discrimination. The only remedy to present discrimination is future discrimination.

Kendi, Ibram. "Ibram X. Kendi defines what it means to be an antiracist," Penguin June 9, 2020, *available at* https://www.penguin.co.uk/articles/2020/june/ibram-x-kendi-definition-of-antiracist.html (last visited Nov. 23, 2021). The phrase "Black Lives Matter" and its part in the "social justice" movement is indistinguishable from these tenets. Compl. ¶21. ISD 194 expressly states in its 2020-2023 Achievement and Integration Plan that it intends to build "anti-racist" classrooms by training teachers on "culturally responsive

9

teaching" practices. ISD 194, Achievement and Integration Plan July 1, 2020 to June 30, 2023, pp. 5-6, available at https://drive.google.com/file/d/1WXTYF2MdYnPRoUcC1Qg HL5jsBe1EmaGo/view (last visited Nov. 22, 2021).

"Black Lives Matter" is also the slogan widely associated with the Black Lives Matter Global Network Foundation. As the Indiana Attorney General recently stated, "Black Lives Matter is a political organization." https://www.in.gov/attorneygeneral /files/Official-Opinion-2021-2.pdf. The Indiana Attorney General further noted that the actions of the Black Lives Matter Global Network and others have made it clearer in recent months (since a July 2021 federal memorandum on a somewhat-related issue) that Black Lives Matter is, in fact, a political organization:

> In October 2020, BLM formed a political action committee ("PAC"), citing its inaugural list of political candidate endorsements and noting its success in raising funds to "actively engage" in the 2020 election. Its 2020 Impact Report notes the PAC's endorsement of several Democratic Party candidates, and includes references to voting for the Democratic Party and Joe Biden. Moreover, a former Executive Director and co-founder of BLM is also a co-founder of the BLM PAC, making it further difficult to argue the two are separate and distinct. The creation of the BLM PAC and the relationship of the co-founder within both organizations raises the question of whether the BLM can now be considered "political," or, as the OSC has already framed – whether the BLM is an organization engaged in "partisan political activity." Given the additional activities, post-July 14, 2020, that now put BLM squarely in the classification of a political organization, any reliance on the OSC guidance memo by schools (or the Indiana Department of Education ("IDOE"), to the extent it had relied on the memo in the past) is no longer valid.
> ….
> School corporations should be mindful to adopt neutral policies regarding the display of signs and other materials that are applied in a uniform and consistent manner to not favor any political group or organization. They must ensure if they permit signs, displays, and other expressive materials or speech promoting one political organization, such as BLM, they must allow the same for all political and similar organizations. Likewise, if the school

organization prohibits one political or similar organization from displaying signs or other expressive materials or speech, it must prohibit all political and similar organizations from displays, promotions, and exhibitions in its schools and on its premises, including BLM and other similar organizations.

*Id.*

The Black Lives Matter Global Network Foundation is a political organization, and "Black Lives Matter" is its political mantra. It has a fundraising arm, grassroots branches, and has created a Political Action Committee that has endorsed candidates for Congress and other partisan offices. https://www.fec.gov/data/committee/C00760686. *See* BLM 2020 Impact Report, p. 25, *available at*: https://blacklivesmatter.com/2020-impact-report/. The Black Lives Matter Global Network Foundation has also created a list of demands. *See* https://blacklivesmatter.com/blm-demands/. Some of those demands include "Convict and Ban Trump from future political office," and "Expel Republican members of Congress who attempted to overturn the election and incited a white supremacist attack." *Id.*

Black Lives Matter Global Network Foundation is not the only organization that employs the slogan, "Black Lives Matter." However, the Black Lives Matter Global Network claims exclusivity as to the term "Black Lives Matter" or "BLM," stating:

Only BLM chapters who adhere to BLM's principles and code of ethics are permitted to use the BLM name… BLM Global Network strongly encourages anyone interested in learning about or becoming a part of our movement to seek information from trusted, official sources — such as our BLM Global Network social feeds (@blklivesmatter), our emails, and our official Black Lives Matters website (blacklivesmatter.com) — rather than unknown or untrusted sources using BLM's name.

https://blacklivesmatter.com/for-immediate-release-statement-by-kailee-scales-managing-director-of-blm-global-network/.

11

Other organizations that claim to be related to the Black Lives Matter slogan are decried as not being affiliated with the Black Lives Matter Movement. "'In a statement to BuzzFeed News, a Black Lives Matter spokesperson confirmed that the groups are indeed 'two completely separate organizations' and that Barnes' foundation 'has nothing to do with us. The Santa Clarita group is improperly using our name,' the spokesperson said. 'We intend to call them out and follow up.'" https://www.buzzfeednews.com/article/ryanmac/black-lives-matter-foundation-unrelated-blm-donations.

Since the above articles in 2020, the BLMGNF has continued to centralize and control the finances of the BLM movement, to the point that some number of smaller organizations are protesting at how the larger organization is not directing sufficient funding their way. https://apnews.com/article/black-lives-matter-90-million-finances-8a80cad199f54c0c4b9e74283d27366f.

ISD 194 allows the private political speech inherent in the BLMGNF and prohibits contrary viewpoints through its Poster Series.

**III.    The District's Other Racially Biased Actions.**

The District's other actions indicate its knowledge and support of the racially biased goals of the Black Lives Matter political organization and ISD 194's commitment to viewpoint discrimination. Compl. ¶31.

Superintendent Michael Baumann's memo of September 22, 2020, acknowledges that the display of the phrase "Black Lives Matter" carries political significance in violation of ISD 194 Policy 535's prohibition on "conduct that is intended to be or that reasonably

could be perceived as endorsing or opposing specific political issues or political candidates." ISD 194 Policy 535(IV)(A)(5); Compl. ¶32.

In addition, when Plaintiff Cynthia Cajune proposed that all cultures, such as Japanese, Norwegian, Dutch, Irish, and so on be represented in an event in which ISD 194 is participating, ISD 194's equity coordinator at first stated, "I like where you are going" and then connected her with those leading the planning for the event. But when Ms. Cajune asked those to whom ISD 194 referred her about being part of the planning committee for the event, the response was cold:

> Let me be explicitly clear about the goal and objective of this committee and event: Our committee is focused on centering equity and bringing awareness to the beautiful diversity from the BIPOC community that is becoming lakeville. Fortunately for European heritage and culture, it is represented and overly represented 365 days a year and has been for centuries. This is not the space for that. This event will only focus on the Cultures and Communities of Color that are underrepresented, specifically the BIPOC community….

> Finally, let me also be explicitly clear: our interests are not aligned. So while there is no place for you or your husband on this committee, you are welcome to attend the event in October and be enlightened….

The writer of this email signed off with the tag line, "Black Lives Matter." Compl. ¶¶33-34.

After Ms. Cajune followed up with ISD 194 seeking to know to what extent ISD 194 is "collaborating" with this racially biased event and apparently ISD-194-supported event, ISD 194 went silent and failed to respond to her request for clarification, demonstrating tacit acceptance of this divisive and non-inclusive statement made to Ms. Cajune. Compl. ¶35.

ISD 194 has also contracted with "equity consultants" who presented to District essential tenets of Critical Race Theory, such as the premise that "Race Neutral" policies and practices "continue to uphold a system where Black, Indigenous, and people of color (BIPOC) experience disproportionately negative outcomes in comparison to white people." ISD 194 has allowed dissemination of these racist ideas in its elementary school classrooms. As just one other example, ISD 194 has shown to fifth-grade students at Eastview Elementary a video from the "BrainPOP" collection that states that "structural racism" in America "makes life easier for White people and more difficult for Black people and People of Color." That same video told these fifth-graders that "Black Lives Matter grew into a movement" and praised the Minneapolis City Council's now-failed 2020 resolution to dismantle the Minneapolis Police Department. https://www.youtube.com/watch?v=xv3dAJUTCT0. Compl. ¶¶36-37.

## IV.    The Plaintiffs Are Parents of Students, Residents, and Taxpayers of ISD 194.

Plaintiffs Bob and Cynthia Cajune are taxpayers who are residents of ISD 194 and pay taxes forwarded to ISD 194 as a pass-through by their County Auditor pursuant to Minnesota law. Compl. ¶10; Minn. Stat. §276.10. Plaintiff Kalynn Aaker is the mother of Plaintiff N.W. and four other minor students who attend ISD 194 schools. Aaker Aff. ¶4.[3]

---

[3] To the extent the Court considers Defendants' submitted affidavit in support of their Rule 12 motion, the Court must consider Kalynn Aaker's responsive affidavit. *Court v. Hall Cty.*, 725 F.2d 1170, 1172 (8th Cir. 1984); *see also Wimberly v. Clark Controller Co.*, 364 F.2d 225, 227 (6th Cir. 1966) (responsive affidavits may be filed on Rule 12 motions where the moving parties file motions in support of their position).

Ms. Aaker is also a taxpayer to ISD 194. Compl. ¶12. She and the Cajunes are also members of LION 194, which is an association of parents in Lakeville who advocate for the children of ISD 194, including against this divisive Poster Series. Compl. ¶11. The Doe and Roe Plaintiffs are also ISD 194 taxpayers. Compl. ¶13.

ISD 194 is made up of a total of 57,959 people, over 11,000 of which are minor students. There are only 20,350 households in the District. https://nces.ed.gov/Programs/Edge/ACSDashboard/2717780.

## LEGAL ARGUMENT

ISD 194 has engaged in viewpoint discrimination by allowing the expression of private political speech supporting the Black Lives Matter political organization and movement, but disallowing contrary viewpoints, such as "All Lives Matter" or "Blue Lives Matter." While ISD 194 claims that it is engaging in government speech, it is not, and the Supreme Court's 2017 warning against such applications of the government speech doctrine is prophetic here:

> But while the government-speech doctrine is important—indeed, essential— it is a doctrine that is susceptible to dangerous misuse. If private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints. For this reason, we must exercise great caution before extending our government-speech precedents.

*Matal v. Tam*, 137 S. Ct. 1744, 1758 (2017).

Because the government speech doctrine does not apply to efforts to squelch competing speech in government fora, the First Amendment's forum analysis applies here.

The Lakeville Schools' hallways and classrooms are limited public fora by virtue of the Poster Series, which opened up those hallways and classrooms for expression. ISD 194 cannot regulate the ***content*** of expression in those hallways absent a compelling government interest and narrow tailoring to achieve that interest. *Bowman v. White*, 44 F.3d 967, 975 (8th Cir. 2006). And even if the District's hallways and classrooms, opened up for expression to the Poster Series, are a "nonpublic forum," the exclusion of contrary viewpoints still fails First Amendment scrutiny because the exclusion is based on Plaintiffs' viewpoint, which is "all the more blatant" discrimination. *Rosenberger v. Rector*, 515 U.S. 819, 829 (1995).

The Poster Series, which launders private expression in the form of the political mantra, "Black Lives Matter," and prohibits the dissemination of contrary messages, violates the First Amendment and should be enjoined.

## I.      Standard for These Cross-Motions.

The Court faces cross-motions for judgment on the pleadings and for a preliminary injunction under Rule 65. Because Defendants supplemented the record on a Rule 12(c) motion, however, it "must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d).[4] Because the merits analysis for a Rule 56 motion overlaps with the Rule

---

[4] Defendants cite case law related to supplementation of the record on Rule 12(b)(1) motions related to subject-matter jurisdiction, but these cases do not relate to Rule 12(c) motions. Rule 12(c) and 12(b)(6) motions are subject to a different standard than Rule 12(b)(1) motions related to subject-matter jurisdiction. The Court can only consider the Massaros Affidavit so long as the Court considers Plaintiffs' contrary affidavits and converts the motion to a Rule 56 motion. Fed. R. Civ. P. 12(d) (providing that "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not

65's "likelihood of success" prong, we present both arguments within the Rule 65 analysis.

On a Rule 56 motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court "draw[s] all reasonable inferences in a light most favorable to the nonmoving party." *Pals v. Weekly*, 12 F.4th 878, 881 (8th Cir. 2021).

To obtain a preliminary injunction under Federal Rule of Civil Procedure 65, "a plaintiff…must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Resources Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981).

In addition, because "'[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury,'" the irreparable harm element is satisfied if Plaintiffs are likely to succeed on the merits." *Powell v. Noble*, 798 F.3d 690, 702 (8th Cir. 2015) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Further, in the First Amendment context,

> [t]he determination of where the public interest lies also is dependent on the determination of the likelihood of success on the merits of the First Amendment challenge because it is always in the public interest to protect constitutional rights. The balance of equities, too, generally favors the constitutionally protected freedom of expression. In a First Amendment case, therefore, the likelihood of success on the merits is often the determining factor in whether a preliminary injunction should issue.

---

excluded by the court, the motion must be treated as one for summary judgment under Rule 56").

*Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2009) (citations omitted).

As Plaintiffs demonstrate, they are likely to succeed on the merits of their claims, and the other *Dataphase* factors favor them. The Court should therefore deny Defendants' motion for judgment on the pleadings and grant Plaintiffs' motion for a preliminary injunction.

## II.    Plaintiffs Have Standing as Parents, Students, or Municipal Taxpayers.

As demonstrated by the pleadings and by the Affidavit of Kalynn Aaker,[5] Plaintiffs are parents, are suing on behalf of students, and are municipal taxpayers of ISD 194. They easily satisfy the requirements for standing in this case.

### A. Kalynn Aaker and Her Children Have Standing to Sue as a Parent of Students and as Students in the District.

Despite Defendants' improper supplementation of the record on this Rule 12(c) motion, Kalynn Aaker has standing to sue as a parent of children in ISD 194. As noted above, Plaintiffs' counsel was not aware of the withdrawal of N.W. from ISD 194 because of ISD 194's continued creation of a hostile educational environment for her. Joseph Aff. ¶ 2; Aaker Aff. ¶3. Tony Massaros' affidavit was the first the undersigned had heard of this. Joseph Aff. ¶ 2. Upon investigation, this is true. Aaker Aff. ¶2. But if Mr. Massaros

---

[5] Again, this affidavit is only presented to the Court because Defendants submitted the affidavit of Tony Massaros related to Ms. Aaker and N.W.'s standing.

is "familiar with Plaintiff N.W.," Massaros Aff. ¶4, then he also must know that N.W. has four siblings in the District. Aaker Aff. ¶4. It should trouble the Court that Mr. Massaros submitted an affidavit clearly calculated to try to get a dismissal on standing despite his admission that he knows who N.W. is and therefore must know, or is easily able to ascertain, whether N.W. has siblings currently in the District. *See* Massaros Aff. ¶4.

Plaintiff Aaker clearly has standing to assert claims for her children under 42 U.S.C. §1983 and Title VI. *Pocono Mountain Charter Sch. v. Pocono Mountain Sch. Dist.*, 908 F. Supp. 2d 597, 616 (M.D. Pa. 2012) (parents have standing to bring Title VI claims because of Title VI injuries to their schoolchildren); *Pollack v. Reg'l Sch. Unit 75*, 12 F. Supp. 3d 173, 201 (D. Me. 2014) (plausible allegations that "the 'real rationale' for the District's restriction is its 'disagreement with the underlying ... perspective' that B.P. and his parents plan to express" were sufficient to give parents standing to sue under the First Amendment and Section 1983).

Even if the Court were inclined to disagree, Plaintiffs should be allowed leave to amend the Complaint to include N.W.'s other siblings as Plaintiffs given the surprise of N.W. leaving ISD 194, and allegations from N.W. consistent with Ms. Aaker's affidavit relating to why N.W. left the District. Plaintiffs have filed a conditional motion to amend based on this premise and request that the Court grant it if the Court is inclined to dismiss with the current roster of Plaintiffs.

**B. The Pseudonymous Plaintiffs Have Standing to Sue, and the Court Should Grant Them Leave to Proceed Pseudonymously.**

Plaintiffs acknowledge that proceeding pseudonymously is not a given, but are surprised that Defendants care to dispute the pseudonymous plaintiffs proceeding as such, given that the pseudonymous plaintiffs' interests are consistent with the interests of the named plaintiffs and the pseudonymous plaintiffs pleaded that they fear retribution of the same kind faced by the Bittersweet Bakery. *See generally* Compl. The Court should simply grant the pseudonymous plaintiffs leave to proceed as such.

Several considerations determine whether a plaintiff's privacy interests substantially outweigh the presumption of open judicial proceedings. "They include: (1) whether the plaintiffs seeking anonymity are suing to challenge governmental activity." *Doe v. Porter*, 370 F.3d 558, 560 (6th Cir. 2004). In *Porter*, for example, plaintiffs were allowed to proceed pseudonymously because their lawsuit required them to "reveal their beliefs about a particularly sensitive topic that could subject them to considerable harassment." *Id.* The Sixth Circuit there considered as important the fact that people had expressed their opposition to the lawsuit in public fora. *Id.*

Likewise here, activists in Lakeville rallied to "cancel" a bakery, the Bittersweet Bakery, when its owner publicly stated opposition to Critical Race Theory in Lakeville schools. Compl. ¶13. Just because some of the Plaintiffs are willing to take the risk of that harassment—and it has happened to them—does not mean that proceeding in this lawsuit should be that kind of risk for every plaintiff.

The pseudonymous plaintiffs' standing is bound up in the standing of Kalynn Aaker and Bob and Cynthia Cajune, and they have standing under those analyses.

**C. The Municipal Taxpayer Plaintiffs Have Standing Under the *Everson***

Case.

As residents of Lakeville ISD 194, Plaintiffs Bob and Cynthia Cajune and Kalynn Aaker, along with the similarly situated pseudonymous plaintiffs, have "municipal" taxpayer standing to file suit against the "municipal" entity that deprived them of their First Amendment rights, which is ISD 194.

> **1.** ***Huizenga* was wrongly decided, and this Court is not bound by other judges' decisions within the District.**

The *Huizenga* Court—in a decision currently on appeal—rested its decision to the contrary on an analogy to the *Everson v. Board of Education of Ewing Township* case. But the *Huizenga* Court mistook the nature of Minnesota's school district taxation system. *Huizenga* was incorrectly decided, and this Court has no obligation to follow its decision.

On the issue of municipal taxpayer standing, the Supreme Court has held:

> The interest of a taxpayer of a municipality in the application of its moneys is **direct and immediate** and the remedy by injunction to prevent their misuse is not inappropriate.

*Doremus v. Bd. of Ed. of Borough of Hawthorne*, 342 U.S. 429, 433-34 (1952) (citing *Commonwealth of Massachusetts v. Mellon*, 262 U.S. 447, 486 (1923) (*Frothingham v. Mellon*) (emphasis added)). The *Doremus* Court's decision rested in part on *Everson v. Board of Education of Ewing Township*. There, the appellant predicated his standing on "his capacity as a ***district taxpayer***." *Everson v. Bd. of Ed. of Ewing Twp.*, 330 U.S. 1, 3 (1947) (emphasis added).

Relying on *Frothingham*'s characterization of the "peculiar relation of the corporate taxpayer to the corporation," 262 U.S. at 487, the *Huizenga* Court rejected the plaintiffs'

municipal taxpayer standing because "plaintiffs can only use their municipal taxpayer status to sue the municipal entities to which they paid taxes." *Huizenga v. Indep. Sch. Dist. No. 11*, No. 20-CV-2445 (NEB/ECW), 2021 WL 2515361, at \*3 (D. Minn. June 18, 2021). The Court there erroneously believed that the plaintiffs did not pay taxes to the school district defendant in the ***exact same way*** as the *Everson* plaintiffs. *Id.* at \*4. When that relationship is properly understood, and when the *Huizenga* Court's own analysis of *Everson* in its footnote 7 is applied, the plaintiffs there have standing, and the Plaintiffs here have standing.

Minnesota school districts are, definitionally, public corporations. Minn. Stat. § 123A.55. They receive the vast majority of their funding from state funds and from tax levies on property within each district. They receive the local property tax dollars specifically from property owners within the district, with the County Auditor as a mere pass-through.

To explain more fully, after property taxes are collected in a given year from District residents, the County Auditor forwards to the District those tax dollars pertaining to it. Minn. Stat. § 276.10 ("On the settlement day determined in section 276.09 for each year, the county auditor and county treasurer shall distribute all undistributed funds in the treasury. The funds must be apportioned as provided by law, and credited to the town, city, school district, special district and each county fund."). The County Auditor is nothing more than a pass-through entity for ISD 194 and the *Huizenga* defendant (ISD 11), and it simply makes sure the dollar amounts are correct and sends the money forward. ISD 194, like ISD 11 in *Huizenga*, unquestionably receives a portion of the property tax payments

made by Plaintiffs, automatically forwarded by the Dakota County Auditor.

ISD 194, like ISD 11 in *Huizenga*, also levies funds from Plaintiffs via referenda pursuant to a statutory process outlined in Minn. Stat. § 126C.17, Subd. 9. In general, "[t]he [general education] revenue authorized by section 126C.10, subdivision 1, may be increased in the amount approved by the voters of the district at a referendum called for the purpose. The referendum may be called by the board.…" *Id.* at Subd. 9(a). ISD 194 must provide notice to taxpayers within the district that this levy will occur. Importantly:

> The notice must project the anticipated amount of tax increase in annual dollars for typical residential homesteads, agricultural homesteads, apartments, and commercial-industrial property within the school district….The notice must include the following statement: "Passage of this referendum will result in an increase in your property taxes."

*Id.* at Subd. 9(b).

ISD 194 proposed, and the voters passed in both 2019 and 2021, tax levies and bond referenda in place today. *E.g.*, https://www.isd194.org/Page/1608. These levied funds are collected through property taxes. Again, there is no question that Plaintiffs' tax dollars are collected by the Dakota County Auditor and then directly paid over to ISD 194. Minn. Stat. § 276.10. And again, the County Auditor is only a pass-through for ISD 194—the Auditor merely makes sure the numbers are right before forwarding the tax receipts.

Given these facts, the *Huizenga* Court's own *Everson* analysis conclusively supports Plaintiffs' standing here. In footnote 7, that Court interpreted *Everson*:

> The state court in *Everson* explained that the New Jersey legislature had "delegate[d] taxing powers to local school districts to raise funds for local school purposes." *Everson v. Bd. of Educ.*, 44 A.2d 333, 336 (N.J. 1945), *aff'd*, 330 U.S. 1 (1947); *see id.* ("School districts, such as the appellant, are authorized by R.S. 18:7–78, N.J.S.A., to raise by special district taxes funds

to defray certain current charges and expenses of the public schools in their districts."); *see also Doremus v. Bd. of Educ.*, 75 A.2d 880, 881 (N.J. 1950) (noting that New Jersey public schools were supported "in part by funds raised exclusively in the school district by levy upon taxable property within the school district."). Because the *Everson* taxpayer sued the school district that levied the taxes at issue, *Everson* does not contravene the proposition that municipal taxpayers only have standing to sue the municipal entities to which he paid taxes.

JA 172-173 (Order at 10-11 n.7).

Minnesota's local governments regularly organize themselves this way for efficient distribution of tax dollars throughout the various school districts. If Defendants were right about municipal taxpayer standing, there would be no remedy for *any* taxpayer to a School District to ever challenge unconstitutional actions as such in the State of Minnesota. Virtually all municipal taxpayer standing would be foreclosed under their theory. This is plainly not contemplated by *Everson* and it would open the door for even more egregious First Amendment abuses like those at bar.

Next, a closer look at the New Jersey statutes referenced in *Everson* fully supports standing here. In 1967, the New Jersey Legislature revamped its Education Code, passing Title 18A to replace the Title 18 which had been in place during the *Everson* case. N.J. Sess. L. 1967, p. 941; Acts of the Legislature of New Jersey, 1967, Volume II, Section 18A:22-33, referencing R.S. 18:7-78, available at https://dspace.njstatelib.org/xmlui/handle/10929/54666. The revamped code provides for a "special district tax" to be voted on by the district voters, and if approved, to be certified "to the county board of taxation," and "the amounts so certified shall be included in the taxes assessed, levied, and collected in the municipality or municipalities comprising the district for such purposes." *Id.*;

*compare* N.J. Rev. Stat. § 18A:22-33 (2012) (referencing R.S. 18:7-78).

As Plaintiffs explain above, that is *exactly* what Minnesota law does for ISD 194—it can levy, and currently is levying, tax dollars from Plaintiffs' property taxes, which are certified to the county auditor and then collected from Appellants and other ISD residents. The applicable Minnesota law is indistinguishable from the New Jersey law the *Huizenga* Court claimed was distinguishable.

There is absolutely no question that ISD 194 is an entity to which Plaintiffs "pa[y] taxes." Under the *Huizenga* Court's own *Everson* analysis, that Court should have held that those plaintiffs have standing.

### 2. ISD 194 taxpayers have standing for the same reasons that compelled subsidy plaintiffs have federal court standing.

The Supreme Court has described the type of compelled subsidy that violates the First Amendment as one where "an individual is required by the government to subsidize a message he disagrees with, expressed by a private entity." *Johanns*, 544 U.S. at 557. In addition, the Supreme Court has held that "mandated support is contrary to the First Amendment principles set forth in cases involving expression by groups which include persons who object to the speech, but who, nevertheless, must remain members of the group by law or necessity. See, *e.g., Abood* . . . ."). *United Foods*, 533 U.S. at 413.

So long as Plaintiffs live within the geographical boundaries of ISD 194 and pay property taxes, they "must remain members of the [forced subsidy paying group] by law or necessity." The mushroom growers in *United Foods* and the municipal taxpayers in this

case are substantially similar for purposes of standing analysis. Like the mushroom growers were forced to pay for objectionable marketing in *United Foods*, municipal taxpayers within ISD 194's geographical reach, "by law," must pay property taxes allocated directly to ISD 194 and then used to subsidize some members of the community's "Black Lives Matter" ideology. ISD 194's taxpayers also have a unique interest in *local* spending like the interest in *industry* spending of the mushroom growers in *United Foods* or the agency-fee payers in *Abood* and *Janus*. It is therefore no surprise that the Supreme Court's compelled subsidy jurisprudence is strikingly similar to the Supreme Court's view of municipal taxpayer standing:

> The interest of a taxpayer of a municipality in the application of its moneys is direct and immediate….The reasons which support the extension of the equitable remedy to a single taxpayer in such cases are based upon the peculiar relation of the corporate taxpayer to the corporation, which is not without some resemblance to that subsisting between stockholder and private corporation.

*Frothingham*, 262 U.S. at 486-87.

The population of the District in comparison to the number of public employee union members in *Janus* is striking. ISD 194 is made up of a total of 57,959 people, over 11,000 of which are minor students. There are only 20,350 households in the District. https://nces.ed.gov/Programs/Edge/ACSDashboard/2717780. In *Janus*, Mark Janus was one of about **35,000** public union members. *Janus v. AFSCME, Council 31*, 138 S. Ct. 2448, 2461 (2018). The number of taxpayers with standing to sue ISD 194 is likely less than the number of union members who could have sued AFSCME Council 31 in *Janus*. That "direct and immediate" interest identified in *Frothingham* is just as direct and

immediate here. The same interests which support standing in compelled subsidy cases support standing in the municipal taxpayer realm.

> **3.  Any fair reading of the Complaint would conclude that the "inclusive" Poster Series at issue resulted from the expenditure of District funds.**

Defendants make an absurd and hyper-technical claim that Plaintiffs did not expressly allege that the so-called "inclusive" Poster Series at issue did not result from the spending of District tax dollars. To read the Complaint this way would be uncharitable, at best. Defendants, who possess all records of their expenditures, say absolutely nothing to support their claim—are they claiming that the posters were donated?[6] No evidence supports that counter-allegation. Under Rule 56 (or Rule 12, if that were the standard), the Court must take all reasonable inferences in Plaintiffs' favor. Posters cost money. The only reasonable reading of the Complaint would infer that the posters were a District expense which used dollars from its funding sources described above. Under any reading of the theory, municipal taxpayer standing is available to challenge that expenditure.

> **4.  Vindication of First Amendment rights should be encouraged under the municipal taxpayer standing doctrine.**

Finally, it is a particularly bad policy to deny municipal taxpayers the right to enjoin viewpoint discrimination against them using their local tax dollars. Violation of First Amendment rights, "even for minimal periods of time, unquestionably constitutes irreparable harm." *Elrod v. Burns*, 427 U.S. 346, 373 (1976). And again, in the compelled

---

[6] If so, this would even further support Plaintiffs' assertion that the posters are private political speech laundered via the ISD 194 Board and Superintendent.

subsidy arena, First Amendment rights are exceptionally strong. *Janus*, 138 S. Ct. at 2460. ("to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves and abhor[s] is sinful and tyrannical") (quoting A Bill for Establishing Religious Freedom, in 2 Papers of Thomas Jefferson 545 (J. Boyd ed. 1950)).

For these reasons, the Court should hold that Plaintiffs have municipal taxpayer standing to sue here.

### D.  LION 194 Has Associational Standing.

Plaintiffs do not dispute that associational standing requires individual members of the association to have standing themselves to sue. As discussed herein, Kalynn Aaker and Bob and Cynthia Cajune are members of LION 194. Aaker Aff. ¶5; Compl. ¶11. For the same reasons they have standing, LION 194 has standing.

### III.    Plaintiffs Are Likely to Succeed on the Merits.

As noted above, many of the factors for the preliminary injunction analysis in First Amendment claims merge together. Most important is the success on the merits analysis, which typically swallows the public interest and irreparable harm analysis in First Amendment claims. *Powell v. Noble*, 798 F.3d 690, 702 (8th Cir. 2015) (quoting *Elrod v. Burns,* 427 U.S. 347, 373 (1976)); *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2009). Plaintiffs consistently assert that because they are likely to succeed on the merits, they are entitled to injunctive relief in this context.[7]

---

[7] To the extent the analyses are not coextensive, the loss of First Amendment rights is *per se* irreparable harm, *Elrod v. Burns, supra*, and the interest in upholding citizens' First Amendment rights is stronger than the interest in a government body squelching them.

## A. Plaintiffs Are Likely to Prevail on Their First Amendment Claims.

Whether the Court views the hallways and classrooms of Lakeville's public schools as a limited public forum or a nonpublic forum, Plaintiffs prevail. ISD 194's laundering of political "Black Lives Matter" speech and forbidding of contrary messages is not government speech; it is viewpoint-based discrimination in a limited public forum. Courts have specifically warned against conduct just like the District's, which is a thinly-veiled effort to hide behind the government speech doctrine to present preferred political messaging by select members of its staff and community. The speech of select employees of the District who choose to present "Black Lives Matter" political materials to students does not constitute government speech any more than divergent viewpoints among staff members differ from curriculum adopted by the District.

### 1. ISD 194's Poster Series is not "government speech."

As discussed above, the Supreme Court warned against the abuse of the government speech doctrine in 2017:

> But while the government-speech doctrine is important—indeed, essential—it is a doctrine that is susceptible to dangerous misuse. If private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints. For this reason, we must exercise great caution before extending our government-speech precedents.

---

*E.g., Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cty.*, 513 F. Supp. 3d 593, 622 (W.D. Pa. 2021).

*Matal v. Tam*, 137 S. Ct. 1744, 1758 (2017).[8] Nonetheless, evidently by virtue of staff and instructors' employment at ISD 194, Defendants claim that they can adopt any private political viewpoint, slap a government imprimatur on it, and avoid this Court's review. Not so. This Court must recognize Defendants' efforts to cloak its First Amendment violations for what they are: an effort to stifle opposing viewpoints in favor of preferred political messaging.

The test for what qualifies as "government speech" immune from challenges based upon viewpoint discrimination is discussed in *Gerlich v. Leath*, 861 F.3d 697, 707-08 (8th Cir. 2017). There, the Eighth Circuit considered three factors from the Supreme Court's *Walker v. Texas Division, Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239 (2015):

> First…whether the government has long used the particular medium at issue to speak….Second…whether the medium is often closely identified in the public mind with the state….Third…whether the state maintains direct control over the messages conveyed through the medium.

*Gerlich*, 861 F.3d at 708 (cleaned up). Each factor will be discussed in turn.

First, there is no evidence that ISD 194 has long used political posters in hallways and classrooms to speak. In fact, until this year, it claimed to have a policy against it. One can only imagine the uproar if ISD 194 chose to put up posters supporting Donald Trump and stating animosity toward Joe Biden, or claiming that the 2020 election was stolen.

---

[8] Further, "the government speech doctrine does not apply if a government entity has created a limited public forum for speech." *Gerlich v. Leath*, 861 F.3d 697, 707 (8th Cir. 2017). As Plaintiffs argue below, Defendants created a limited public forum by allowing the posting of the Poster Series in its hallways and classrooms. If the Court agrees, it need not engage in further analysis of the government speech doctrine.

Make no mistake, the Poster Series is a new creature, and it is intentionally designed to express the preferred speech of "students, school staff, school building leaders, the School Board, community advisory groups and others," Compl. ¶8, to the detriment and in opposition to speech like Plaintiffs'. The stated "central purpose of the program" is to "affirm and support" certain ethnicities while refusing to take the same step for others. October 13, 2020 ISD 194 Regular School Board Meeting, at 2:09:40, *available at* https://isd194letv.viebit.com/player.php?hash=G8FTFxRoB06Q# (last visited Nov. 23, 2021). The Poster Series is expressly intended to "give Black people a specific place of honor," and not others. March 17, 2021 ISD 194 Board of Education Work Session at 1:53:12, available at https://isd194letv.viebit.com/player.php?hash=cnRL9UBOdneP. This notion of preferential treatment for some students based on race has also been expressed, variously, as an "unwavering commitment," an "acknowledgment," "centering equity," and "bringing awareness" by exclusively focusing on certain races. *See generally* Compl. The very nature of the messaging behind these posters is such that students and members of the community are divided by race, with some being elevated above others; this is not government speech by any definition.

Second, there is no evidence that the medium at issue is closely identified in the public mind with the state. Rather, private parties and entities responsible for the design of the posters exercised extensive editorial control, including determining what the posters looked like, fine-tuning details of the races and genders of the characters in the posters, and how many posters were to be hung in which places. Non-government entities also determined how the posters were to be hung, including framing. There is no indication that

31

the ISD 194 School Board exercised any editorial control in the creation of the posters. These posters were revised by the public, where committees and focus groups were chosen by the District. The private parties were chosen specifically because they were not representatives of the District and could provide input as private citizens in crafting the message within the posters. *See* April 27 ISD 194 Regular School Board Meeting at 00:31:40-00:32:10, *available at* https://isd194letv.viebit.com/player.php?hash=5XPZCbrakrgG# (last visited Nov. 23, 2021). This prong tilts decidedly against government speech.

Third, ISD 194 does not exercise direct control over the Poster Series. It is like a pillow ripped open with its feathers scattered to the wind. The District allows teachers and employees to post these posters in District hallways and classrooms. It does not control the Poster Series' direct placement. Thus, the "literal speaker" in the Poster Series is properly understood as either the teacher who chooses to display the posters in his/her classroom, or the school official who elected to display the posters in the hallway. To the extent that the creators are understood as the "speakers," this factor weighs heavily in favor of finding that this constitutes private expression, and not government speech. The decision on whether to "speak" through the posters in support of the "Black Lives Matter" political ideology is left to individuals.

The government speech doctrine requires that the government have the final approval authority over a message for something to be government speech. Here, the posters were first presented to the school board on March 17, 2021 as finished products. By that time, they had been reviewed and edited by the Equity Steering Committee

composed of school district teachers, designed by students, and shown to focus groups of parents. The school board did exercise minor input, and there was a long discussion about whether the words "Brown Lives Matter" were necessary because Black Lives Matter referred only to Black people, but the school board took no official action to allow or change the posters. The only edit discussed was an edit changing a blonde girl holding a rainbow flag, saying "be proud of who you are," into a blonde boy, and that was agreed to before the Poster Series hit ISD 194 classrooms and hallways.

This is in stark contrast to the Board Communication section of ISD 194's school board meetings, where the school board prepares remarks, and then has the chair of the school board speak and address the issues that were addressed in previous public comments or that would benefit the community. When Zach Duckworth, a former faculty member, addressed the audience during the board communication and said "Black Lives Do Matter," this is much more likely to be classified as government speech, as it was not selected, directed, edited, and implemented by private citizens. October 13, 2020 ISD 194 Regular School Board Meeting, at 00:49:50-00:50:31, *available at* https://isd194letv.viebit.com/player.php?hash=G8FTFxRoB06Q (last visited Nov. 23, 2021).

The Poster Series was specifically designed to facilitate private speech by teachers and to be added to classrooms of teachers who desired these posters. The posters were to be ordered by teachers or principals from a catalog, and the notion that the messages could be turned into shirts or displayed by alternate means was also discussed. That catalog included all eight of the posters that were designed, allowing teachers to pick and choose

their preferred speech. Just as the school district said, these posters are to satisfy and enable teachers to engage in private speech. They are not to announce a message from ISD 194. They are products of a limited number of students, parents, and teachers of ISD 194, whose political views aligned with a chosen viewpoint. This precludes these posters from being government speech; instead, they are private speech by private speakers whose District has affixed its "seal of approval" to create viewpoint discrimination.

## 2.    The hallways of ISD 194 are limited public fora.

Defendants contend that, under *Walker v. Texas Div., Sons of Confederate Veterans, Inc.,* and by virtue of the District's failure to officially designate the pertinent portion of the school a "limited public forum,"[9] the District has insulated itself from accountability under the First Amendment. Specifically, Defendants argue that, because no principal, superintendent, or school board "took any action to designate or approve any portion of District property as a limited public forum," Plaintiffs' speech may properly be curtailed. Defs. Br. at 23. This argument fails for multiple reasons.

First, as *Walker* establishes, a government creates a limited public forum by

---

[9] Defendants argue that there is a distinction between limited public forums and nonpublic forums and that because the walls are a nonpublic forum they are held to a lesser standard. But this court and the Eighth Circuit have held otherwise. "The Supreme Court uses the terms 'nonpublic forum' and 'limited public forum' interchangeably. Both refer to situations in which the government has created a forum for expressive activity but limited that forum to certain speakers or certain topics or in some other respect." *Viewpoint Neutrality Now! v. Regents of U. of Minnesota*, 516 F. Supp. 3d 904, 917 n.19 (D. Minn. 2021) (footnote 19) (citing *Victory Through Jesus Sports Ministry Found. v. Lee's Summit R-7 Sch. Dist.*, 640 F.3d 329, 334 (8th Cir. 2011)). But even if the Court were to hold that the hallways of ISD 194 are a "nonpublic forum," they still may not host viewpoint discrimination. *Bowman*, 444 F.3d at 976.

"intentionally opening a nontraditional forum for public discourse." 576 U.S. at 215 (quoting *Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.*, 473 U.S. 788, 802 (1985)). "And in order to ascertain whether [a government] intended to designate a place not traditionally open to assembly and debate as a public forum, [the] Court has looked to the policy and practice of the government and to the nature of the property and its compatibility with expressive activity." *Id.* at 215-16.

Here, by authorizing and allowing the expression of certain preferred speech espoused by members of the public through teachers and faculty in the form of posters, ISD 194 took deliberate action to use its walls for expressive private speech. The decision to allow the posters was not taken lightly. The record indicates that extensive debate took place among the School Board, members of the public, students, and staff, during which several people expressed caution that the messaging in the "Black Lives Matter" posters was political, divisive, and would raise public ire. Nonetheless, ISD 194 intentionally opened its hallways and classrooms to political expression.

Second, *Walker* does not stand for the proposition that a formal policy must be adopted to create a limited public forum. The walls of the school became limited public fora when the decision was made to authorize their use to deliver a political message. A "limited public forum is a subset of the designated public forum [that] arises where the government opens a non-public forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects." *Bowman v. White*, 444 F.3d 967, 976 (8th Cir. 2006) (internal quotations omitted). If Defendants' interpretation of *Walker* were correct, a government entity could present unopposed and expressly political speech while

maintaining a nonpublic forum by simply refusing to adopt a formal declaration designating the space as a public forum. This has no support in case law or the Constitution.

Third, once the state has opened a place for expressive activity by the public, the Constitution forbids a state actor from enforcing certain exclusions from a forum even if it was not required to create the forum in the first place. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (citing *Widmar v. Vincent,* 454 U.S. 263 (1981) (university meeting facilities); *City of Madison Joint School District v. Wisconsin Public Employment Relations Comm'n,* 429 U.S. 167 (1976) (school board meeting); *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546 (1975) (municipal theater)). And although "a state actor is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum. Reasonable time, place and manner regulations are permissible, and a content-based prohibition must be narrowly drawn to effectuate a compelling state interest." *Perry*, 460 U.S. at 46 (citing *Widmar*, 454 U.S. at 269-270).

Finally, Defendants assert that ISD 194 Policy 535(IV)(C)(1) makes all school district property nonpublic fora. Answer ¶ 26. But Policy 535 doesn't override constitutional forum analysis. As discussed above, nonpublic fora and limited public fora are coextensive in the Eighth Circuit. However, even if nonpublic fora and limited public fora were recognized as applying different standards, the assertion by the School District under Policy 535(VI)(C)(1) has no effect on the legal status of fora for First Amendment Speech Clause analysis. A school district cannot claim that property is not a public forum, then allow private speech there, and evade responsibility for its discrimination between

messages it allows.

In this case, the school district is allowing certain members of the public with certain viewpoints to post posters on the walls of the District. This is the definition of a limited public forum. Merely because a school restricts access to who can avail themselves of the forum does not mean that it is a nonpublic forum. *Viewpoint Neutrality Now! v. Regents of U. of Minnesota*, 516 F. Supp. 3d 904, 924 (D. Minn. 2021) ("And although a governmental entity may restrict access to a limited public forum—after all, that's what makes a public forum a *limited* public forum—those restrictions must be viewpoint-neutral and reasonable and, most importantly for present purposes, come in the discretion of the decision-maker.").

By virtue of allowing the Poster Series to be displayed, ISD 194 has opened its hallways and classrooms to private political expression, and they are limited public fora.

### 3. ISD 194's allowance of "Black Lives Matter" and refusal of "All Lives Matter" or "Blue Lives Matter" is either content-based or viewpoint discrimination.

When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.

*Rosenberger v. Rector and Visitors of U. of Virginia*, 515 U.S. 819, 829 (1995) (citations omitted). Even if ISD 194's restriction is content, as opposed to viewpoint, discrimination, "[s]elective exclusions from a public forum may not be based on content alone, and may not be justified by reference to content alone." *Police Dep't of City of Chicago v. Mosley*,

408 U.S. 92, 96 (1972).

If the Court determines that ISD 194 is engaging in content-based discrimination, then ISD 194 must show that its restriction was narrowly tailored to achieve a compelling government interest. And viewpoint discrimination, a more egregious form of content-based discrimination, is presumed unconstitutional. *Viewpoint Neutrality Now!*, 516 F. Supp. 3d at 919.

Here, ISD 194 has allowed the speech of some citizens on its walls, but disallowed the speech of Plaintiffs based on what their view was on the question of "Whose Lives Matter?" Other speakers receive the support of the District in creating, printing, and posting material that proclaims "Black Lives Matter," but Plaintiffs are forbidden from posting a poster on the same subject, the same content, but a different view. This is impermissible as viewpoint discrimination.

There is no interest that ISD 194 could suggest which could rise to the level of legitimate, much less compelling. Encouraging private political speech of neo-Marxist, race-separatist political organizations is unreasonable and illegitimate. And even if the Court were to find that such an interest were somehow legitimate, ISD 194 has used a ham-fisted approach to its messaging by outlawing all other forms of expression not in keeping with that private political mantra, to Plaintiffs' detriment. ISD 194 has no compelling interest in divisive, racist speech. Similarly, disallowing any contrary message to Black Lives Matter is overbroad and fails to allow counterspeech to the divisive Black Lives Matter mantra. *See Rubin v. Young*, 373 F. Supp. 3d 1347, 1354 (N.D. Ga. 2019) ("a total exclusion of a free speech expression" is not narrowly drawn).

**B. Plaintiffs Are Likely to Prevail on Their Hostile Educational Environment Claims.**

ISD 194 has made it abundantly clear that only its preferred speech—that which espouses the divisive, exclusionary rhetoric of Black Lives Matter—will be recognized and tolerated among students and staff. This has created such a hostile and divisive environment that at least one student who strongly disagrees with the Black Lives Matter messages that ISD 194 has allowed in its halls has been driven from the school entirely as a direct result of the hostility the District created.

In their memorandum, Defendants ignore the class of claims within Title VI for Racial Harassment, as opposed to Racial Discrimination. The standard for a claim for Racial Harassment under Title VI requires that a plaintiff claim (1) defendant is "an educational institution receiving federal funds," (2) plaintiff "was subjected to harassment based on" his race, (3) "the harassment was sufficiently severe or pervasive to create a hostile (or abusive) environment in an educational program or activity," and (4) "there is a basis for imputing liability to the institution." *DJ ex rel. Hughes v. Sch. Bd. of Henrico Cty.*, 488 F. Supp. 3d 307, 332 (E.D. Va. 2020) (quoting *Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007) (per curiam)).

Under these facts, and as to the first requirement, Defendant ISD 194 is unquestionably an institution receiving federal funds. Compl. ¶51.

Under the second element, a plaintiff may show he was harassed "based on" his race by showing that he was treated differently than similarly situated students. *Causey v. Balog*, 162 F.3d 795, 801–02 (4th Cir. 1998) (citing *Carter*, 33 F.3d at 461–62). N.W. and those

students like her, including her siblings S.W., C.W., O.W., and H.W., have been reminded on a daily basis that they are specifically excluded and treated differently from the "Black Lives Matter" political movement espoused by the District. It caused N.W. to see people differently because of their skin color, which is consistent with government policy that should have been relegated to the dustbin of history a generation ago. *See* Compl. ¶53.

Under the third element, harassment is sufficiently severe or pervasive "when it creates 'an environment that a reasonable person would find hostile or abusive' and that the victim herself 'subjectively perceive[s] ... to be abusive.'" *Jennings*, 482 F.3d at 696 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Here, N.W. perceived the message conveyed by the posters, support for the Black Lives Matter movement, as inextricably linked to violence, arson, riots, hostility, and racial hatred. *See* Compl. ¶54. This results in a hostile or abusive environment for a reasonable person in N.W.'s nine-year-old shoes.

Under the fourth element, liability can be imputed to a university when "an official who…has authority to address the alleged discrimination and to institute corrective measures…has actual knowledge of discrimination in the [institution's] programs and fails adequately to respond" or displays "deliberate indifference." *McCarter v. Univ. of N. Carolina at Chapel Hill*, 2021 WL 4482983, at *11 (M.D.N.C. Sept. 30, 2021). Here, District officials not only are currently aware of the divisive nature of the political messages in the posters, but they were also aware before the posters were approved for use within the District. The authority to remedy the problem is plainly within the control of

ISD 194, but their choice is indifference. Plaintiffs have alleged a clear case of racial harassment, and they are likely to prevail on the merits.

### IV.   *Monell* Does Not Apply Where the District Has Formally Approved the Racist Language at Issue.

ISD 194's *Monell* argument is foreclosed by rules under Section 1983 law which the Supreme Court believes "no one has ever doubted," apparently until now:

> No one has ever doubted, for instance, that a municipality may be liable under § 1983 for a single decision by its properly constituted legislative body—whether or not that body had taken similar action in the past or intended to do so in the future—because even a single decision by such a body unquestionably constitutes an act of official government policy.

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). Here, the ISD 194 Board approved the Black Lives Matter posters, and they are continually on display due to the actions of the Board and ISD 194's chief executive officer—its Superintendent. *E.g.,* Minn. Stat. § 123B.143; ISD 194 Policy 302 ("The Superintendent shall have charge of the administration of the schools under the direction of the Board of Education. The Superintendent shall be the chief executive officer of the School District and an ex-officio member of the Board of Education.").

There is no question that the Defendants are subject to liability for prospective relief under *Monell*. The Court should reject Defendants' frivolous argument out-of-hand.

### V.   Superintendent Baumann Is Subject to Suit in His Official Capacity Under *Ex parte Young*.

It is also black-letter law that "[q]ualified immunity is not a defense available to governmental entities, but only to government employees sued in their individual capacity." *Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999); *VanHorn*

*v. Oelschlager*, 502 F.3d 775, 779 (8th Cir. 2007) (citing *Davis v. Hall*, 375 F.3d 703, 710 n.3 (8th Cir. 2004), for the premise that "neither qualified immunity nor absolute immunity [is] available to a government employee sued in his official capacity").

Plaintiffs sued Superintendent Baumann in his official capacity as Superintendent, not in his individual capacity. Compl. ¶15. Superintendent Baumann is therefore subject to suit under the *Ex parte Young* exception to Eleventh Amendment immunity. Under that exception, "a private party can sue a state officer in his official capacity to enjoin a prospective action that would violate federal law." *281 Care Comm. v. Arneson*, 638 F.3d 621, 632 (8th Cir. 2011). School districts are arms of the state for purposes of the state action doctrine. *GME Consultants, Inc. v. Oak Grove Dev., Inc.,* 515 N.W.2d 74, 76 (Minn. Ct. App. 1994) (stating that school districts "are arms of the state and are given corporate powers solely for the exercise of public functions for educational purposes."). The Superintendent is the CEO of ISD 194. Minn. Stat. § 123B.143; ISD 194 Policy 302.

Under the *Ex parte Young* exception, all that matters is that Superintendent Baumann has "some connection with the enforcement of the act" in question. *Id.* at 632 (quoting *Reprod. Health Servs. v. Nixon*, 428 F.3d 1139, 1145-46 (8th Cir. 2005). Here, Defendants admit that the Poster Series was adopted by the District and then posters were rolled out into the District's hallways and classrooms. Defs. Br. 4. Again, Baumann is the Superintendent with full charge of Lakeville schools; he is the CEO of the District. He undoubtedly has "some connection with the enforcement of the act in question."

There is no plausible argument that Baumann is not subject to suit under the *Ex parte Young* doctrine.

## CONCLUSION

For the foregoing reasons, Plaintiffs have conclusively established a likelihood of success on the merits of their Complaint. Accordingly, Plaintiffs respectfully request that Defendants' Motion for Judgment on the Pleadings be denied. Further, because Plaintiffs have demonstrated a likelihood of success, a preliminary injunction is proper and Plaintiffs ask the Court to issue the same forthwith.

                                              **UPPER MIDWEST LAW CENTER**

Dated: November 23, 2021                      */s/ Gregory J. Joseph*
                                              Douglas P. Seaton (#127759)
                                              James V. F. Dickey (#393613)
                                              Gregory J. Joseph (#346779)
                                              8421 Wayzata Blvd., Suite 300
                                              Golden Valley, Minnesota 55426
                                              doug.seaton@umlc.org
                                              james.dickey@umlc.org
                                              greg.joseph@umlc.org
                                              (612) 428-7000

                                              *Attorneys for Plaintiffs*